Good morning, Your Honors. Terry Gross for Appellant. I'd like to reserve two minutes for rebuttal. You bet. This case is predominantly about whether a police officer can arrest a reporter, primarily to prevent the reporter from taking newsworthy photographs. We would not be here today if Mr. Chavez was not engaged in core First Amendment activity at the time of his arrest. I'd like to move directly to the First Amendment issue in this case. The district court granted summary judgment on the basis of qualified immunity on the First Amendment retaliation claim based on the following reasoning. One, Chavez did not present evidence that he had a right to be present at the scene because he did not show that the general public had a right to exit their vehicles on the freeway. And two, that thus... Let me stop you right there now. Isn't that, first of all, the general First Amendment law? The general First Amendment law, we are not claiming that Mr. Chavez has rights any greater than the general public under the First Amendment. But we are claiming that Mr. Chavez, as a member of the media under the California statute, has rights accorded to members of the media... That's not a First Amendment issue. The State lost it. That is correct. That's the question under State law of whether he has a right to be present at the scene, not whether it's not we're not claiming that affects his First Amendment rights, but it certainly affects the issue of whether Mr. Chavez had a right to be present at the scene. I thought you were addressing the First Amendment rights. Excuse me? I thought you said you were going to address the First Amendment rights. I am addressing the First Amendment rights. You were just addressing the State law rights. No, no. The first part of the judge's — you stopped me before I got to the second part, which is the First Amendment right. The first part of the district court's reasoning was that Chavez did not have a right to be present at the scene. And then — No, no. He did not have a First Amendment right. Well, first he said he didn't have a right to be present at the scene to take photographs. And then he concluded, therefore, because he didn't have a right to be present there, he had no First Amendment right to take photographs. Well, he had no First Amendment right to be present at the scene in the middle of a highway during the conduct of accident investigation and busy traffic. That's the essence of why he didn't have a First Amendment right to be there. You acknowledge that an ordinary citizen who is not a journalist would not have a different right than Chavez, correct? That is correct. But members of the media under Penal Code 409.5d do have a right of access to accident scenes. That's not a First Amendment right. That is not the First Amendment right we're claiming. We're claiming, though, that that gave him a right to be present at the accident scene, to be out of his car at the — But that's not a First Amendment right. That is a State right. So how does that violate the First Amendment? That doesn't — his ability to be there at the scene doesn't raise to the level of a First Amendment right. But what happened is the district court then said, because he had no right to be present, he didn't have a First Amendment right. Well, addressing just that point, that an individual that is guilty of some minor traffic infraction is divested of First Amendment rights, we think is very troubling, is that clearly, even in that situation there, what should happen is the normal balancing First Amendment test, which is of a person's First Amendment right to, you know, record or report on newsworthy events, balanced against the police's right to protect public safety. Not that he's divested of a First Amendment right, but there is this balancing test. Do I understand correctly there was a lady on the street waiting for an ambulance for a woman who was on the road? Do I recall that correctly? There was a victim of the accident who was waiting for an ambulance. And they're waiting for emergency equipment to come? That is correct. And is it your position that he has a First Amendment right to stay there even after they tell him he's got to move his car? No. When they told him that he had to move his car, he then started to go to move his car. Well, then he stopped moving his car. Then he decided to take more pictures. He did not stop. Let's put it this way. Instead of making a beeline to move his car, he decided to take more pictures. Is that right? That is not what the evidence shows. The evidence has to be interpreted. He took a couple pictures as he continued to walk toward his car. As he was complying with the order. Now, let me ask you about the scene, though. Weren't there several cars stopped at the scene in that lane of traffic where the accident was? Was it the only car there? Yes. It was the only car that was stopped at the accident? No, not initially. There were several cars. There were several cars. So, he wasn't the only one, as you might say, blocking the ambulance from getting there. There were several cars that were stopped necessarily because of the accident, right? Is that right or not? That he was not the disputed issue. There are disputed issues, in fact, on that issue. But that basically there's evidence that he was not impeding the ambulance at all. Let me re-ask Judge Tashima's question in a different way. Was there anything that prevented him from moving his car? When he was asked to move his car, he then acceded and was going to his car. But he wasn't boxed in by other cars, keeping him from moving his car, is what I think Judge Tashima is asking. No, no, no. My question was, he wasn't holding up the ambulance from getting there, only his car, because there were other cars stopped there, too, weren't there? In the same lane as he was? At this time, there weren't other cars. He was the car directly in front of the accident. There were or were not? There were not. There were not. The other cars had left. There had been other cars that had left. Yes, that is correct. The only cars in that lane then were the car involved in the accident and his car. And then his car directly behind where the scene was. Would it be fair to say that when the police officer told him to move on, this is a traffic accident scene, an ambulance is coming, and told him to move, that he started moving as directed by the officer, but that he slackened his pace in order to take pictures as this ambulance arrived, because it was another opportunity to take pictures, right? Well, there is no – the ambulance didn't – first of all, the ambulance arrived on the other side of the highway. Well, whatever he did, he slackened his pace. He didn't go directly to his car as directed by the officer. There is no evidence that he slackened his pace. He's a professional photographer. He takes photographs. His camera is glued to his hand. In other words, he was taking these photographs while he was running to his car. Is that your position? Walking to his car, and he took – he actually – what happened was is as he was walking to his car, the police officer came up to him within less than a minute after the first conversation and said, I'm going to cite you. He did not take any pictures at that time. And then what happened, you know, and what is evidence was that he turned when this came, but he was still walking, and he didn't take any pictures, and the documentary evidence shows he did not take any pictures at that time. But then what happened is four minutes later when the officer said, can you go to your car and get your registration, as he was walking to his car to get his registration, a late-arriving California Highway Patrol vehicle came on the other side of the freeway. And he was taking pictures of that? That's right. He turned to take a picture, and what happened was is that's when the officer said. And your position is that the officer at that moment had an unreasonable Fourth Amendment or violated his First or Fourth Amendment? Well, they violated his First Amendment right. They violated his First – he was retaliating against him for the exercise of his First Amendment right to take that picture. And as to the Fourth Amendment issues, as in our briefs, they're disputed issues of fact that preclude summary judgment on whether there is probable cause to arrest. I'd like to reserve the rest of my time. Thank you, Mr. Gross. For the city. Good morning, Your Honors. My name is Rachel Wagner of Bertrand, Fox & Elliott. We represent the city of Oakland and the two police officers who were on the scene on that day. First of all, let me ask you, I want to get this factual. You know, the facts aren't very well developed by the evidence. But as I understand it, what Mr. Gross just said was this car of the plaintiff couldn't at all have impeded the ambulance because the ambulance was coming the other way, right,  Is that right? In fact, Your Honor, the car impeded the arrival of the fire truck. And that was – Was there a fire? The fire truck was coming to offer – as part of the emergency operation to offer assistance to an overturned vehicle and a woman laying on the roadway. But that's the ambulance that takes care of the woman on the roadway. I'm not an expert in emergency operations. That's the problem. Nobody is, and we don't know what really happened. Well, was the fire truck responding to the accident? Is that what you're saying? Yes. The fire truck was responding to the accident. The single car, as Mr. Gross admitted to, the single car that was in lane number one, the fast lane besides the overturned vehicle, was Mr. Chavez's car that was unoccupied. The fire truck, Officer Reynolds saw, had to merge into lane number two to get around Mr. Chavez's car. Mr. Chavez says that the fire truck arrived in lane number two, and indeed it did, and that consonance of the facts is set forth in the district court's order in terms of Mr. Chavez's truck not only might impede, will impede, but in fact did impede the arrival of the truck. Now, when did the fire truck arrive in terms of, you know, the interchange between the plaintiff and the officer about, you know, get back to your car, let me see your registration, you know, that kind of stuff? If you look at the record at 146 and 147, and that's Officer Reynolds' testimony, he did say that he was in the process of writing a citation, discussing the citation with Mr. Chavez, and it was after that that he saw exactly what I just described, that he saw the fire truck, and at that point then he detained him. So he didn't write the citation for impeding the fire truck. He was already writing the citation before the fire truck got there. That's correct. All right, now, and that was a citation for what? For violating. For impeding the flow of traffic or something like that, right? The vehicle code 22,000-something? Vehicle. Two tickets, didn't he? There's two citations. One's the 22400A, which has to do with stopping your car on the freeway in a way that would impede the normal movement of traffic. It's not specific to fire trucks. Right. The concern about the fire trucks is the State interest in maintaining the safety of the freeway. The vehicle code section 22400A applies in many situations, not just accident or crime scenes, where you don't have people getting out of the freeway, out of their car on the freeway or stopping it because they're curious about something, whether or not they're a journalist. That law applies. Vehicle code 2800A, which was the second citation, was after Mr. Chavez and several minutes had passed, and Mr. Chavez in his declaration indicates several minutes had passed. And that's it, ER 15 to 17. It was only after approximately 15 minutes, according to Mr. Chavez's own declaration, that he, in fact, was cited for failing to obey. He had argued with the officer or stated he was a member of the press and had a right to be there from the get-go, but he was always, as he put it in his declaration, on his way to his car. A reasonable officer's assessment, and we're looking at qualified immunity for probable cause, is that he had yet to cooperate, he had failed to cooperate with their direction to get to his car. He never did. According to him, and according to Mr. Gross, he was walking toward his car when he was cited. Yes. His car was 150 to 200 feet away, according to him. But the officer says, go to your car, and he was walking toward his car when the officer cited him. And he was walking to his car for quite a few minutes, actually. From the officer's perspective, he's not at his car. So he's cited for walking too slowly? No. He's cited for failing to obey a directive. He had indicated that he had a right to be there. He did not at any time say that he was going to move his car. The timing of the ticket, in other words, the officer told him to go to your car. He started walking, right, and he's walking a while before he gets the ticket. Now, why was he given the ticket after he's walking, you know, we'll say, whatever it is, halfway, quarter of the way, a third of the way? Officer Reynolds and Officer Garcia, I will give you the ER sites, spoke specifically to that issue. Sure. At ER 140 for Officer Reynolds and for Officer Garcia, at 191, 196, 198 through 201, the officers, from their perspective, saw Chavez in the same area in which they talked to him in that he had not gone back to his car and instead was taking pictures. Does that record also reflect that when on his way to the car, he stopped to take a few pictures? They saw him taking pictures. They did not see him at his car. That's a controversial issue of fact because he says that's a controversial issue of fact because Chavez says he was walking to his car. Sure, the officers contradict him, but you can't give summary judgment on the basis of a controversial fact. I would disagree respectfully that there's a dispute here because we're not disputing whether he was walking towards his car. And Chavez himself says he never got to his car, he was walking towards it, and provides timestamps in his declaration, and it was taking him about four minutes to do that. 150 to 200 feet. So there's a reasonable assessment. Remember, it's a reasonable belief under qualified immunity of what the officer is seeing is someone walking, turning when the ambulance comes, taking a picture, but never getting to his car, and also never indicating that he would do so. Well, I think the appellant himself said that on the way to the car, he took some pictures, but it didn't slacken his pace to get to the response to the officer's direction. The second ticket was for failure to obey the officer's order. Is that it? The second ticket is for failure to obey the officer's directive. And while Mr. Gross may have said that he didn't slacken his pace, I don't recall that anywhere in the record. What I did see in the record that was interesting. Well, he took the pictures. He acknowledges after he was told to move on, when he saw the next vehicle arrive, the state, I guess it was the state police, he took some pictures of that vehicle with the flashing lights. Right. He took two different pictures, one of an ambulance, one of the CHP. Oh, the CHP. And he took those after he was directed to move on. Correct. The CHP is like time-stamped, like about, we'll say in the middle of his walk or something like that, right? Yes. Is that right? Yes. And may I point to Mr. Chavez's evidence because we're, of course, avoiding his core dispute. This has to do with the core facts for the probable cause, the belief in probable cause. Here are two very interesting facts right out of Mr. Chavez's declaration and appearing in the district court's opinion. First, at ER 15, paragraph 7 of his declaration, he says he was at the scene for 15 minutes before Officer Reynolds came. He came upon the accident and was there for 15 minutes. When you move to paragraph 9 of his declaration, the very next page, 16, he says that he took that picture of the CHP's arrival  and the court noted in its paragraph on this that somehow there's that 15 — there's this time lapse. Another 15 minutes. No. The Officer Reynolds comes after he's been on the scene for 15 minutes, and then — Another 15 minutes. Somehow. Now, if you look at the — What's your point? What's the point? My point is that he's not running to his car right after he talks to — making a beeline, I think it was, to his car right after Reynolds talks to him. And both Reynolds and Garcia are seeing him in the same area. He doesn't dispute that he was in the same area. He says he was on his way to his car. Those are discrepancies. Those aren't fact disputes. In fact, they're consonant with the officer's assessment that someone continues to go towards his car but never gets there. And at some point, that's failure to obey direction. And 2800 specifically says fail to obey. It's not just an outright refusal. He didn't comply. The other interesting point from that same declaration of Chavez is he had these two time stamp photos. And we contend whether it was two minutes or ten minutes doesn't matter. But what is interesting is that one time stamp photo is 247, and that's at ER 17. That's a photo of what? It's a photograph that he took. Don't spend any time looking it up. Sorry. It's in paragraph 13 at ER 17. This is a photograph that he was taking when Officer Reynolds was going to give him a citation. This is the ambulance. If you look at paragraph 14 right after that, the next photograph of the CHP vehicle proceeding, that is four minutes later, four minutes from the site. And he's still not at his car. Your Honors, I think the officers are entitled to qualified immunity, believing they had probable cause and believing the First Amendment in no way ever protected this activity in the first instance. He was on his way to his car, and the officer was a little too big for his britches and should have let him go to the car and was presumptuous in issuing this summons and arrest. Well, Your Honor, our position has been that the officers were doing their job. Mr. Chavez was second-guessing their authority in terms of their authority to decide and he couldn't be on their forbearance to issue them a citation. And now he's asked the district court to do the same. The district court applied qualified immunity given the facts that the officers had in hand and that they had a reasonable belief they were not violating his constitutional rights. There's nothing else that's needed to dismiss the case. Thank you, Ms. Wagner. Thank you. Mr. Gross, I think you had about a minute and a half left. Go ahead. First, as to whether Mr. Chavez was disobeying a police instruction to leave, the case People v. Kiroga, 16 Cal. Ab. 4th. 961, citing the Supreme Court case Houston v. Hill, says a similar penal code section, 148, about complying with a police officer, says it surely cannot be supposed that penal code section 148 criminalizes a person's failure to respond with alacrity to police orders. Moreover, appellant possessed the right to dispute the officer's actions. And, in fact, Judge Silberman, in the Resic case, 41 Fed. App. X. 57, that a similar issue came up, is that to have an interaction, discuss something with a police officer is not a disobeyal of the offer. And a lot of this depends — Well, could you discuss with the officer whether or not the officer is right in telling you to move on, he's investigating this traffic scene, don't you have to listen to him, right or wrong, and then litigate later whether or not the order was constitutional or improper? The question is whether he disobeyed. And the officer said to him, you know, can you go to your car? And he says, but I'm a member of the media, you know, because there is this California statute that provides access. The officer says, I don't care. And then he says, but doesn't it give a right of access to members of the media? And he says, well, it's a crime scene. And then he says, okay. He never says I'm not going to obey. He's trying to discuss the parameters of the law. What's your response to this, though? Now, you said earlier, and I think it's correct, that in his affidavit, Mr. Chavis as well, when he was told to go to his car, he was walking toward his car, and although he was taking pictures, he never stopped. But on the other hand, as your opponent showed, if you look at the time lapse in these photos and all that, he took, you know, five or ten minutes or more to walk 100 feet. Actually, that's so. What I'm saying is if that explains what your client meant by, you know, continue to walk when taking pictures, that's, you know, on a qualified immunity analysis, you know, shows, it's reasonable for the officer to conclude he's not complying with the order, isn't it? Well, respectfully, Ms. Wagner misinterpreted the record here in the time stamps. What those photographs show, what they show is that at 245 was the last time he was taking a picture of the scene. Reynolds then talks to him. That conversation takes about a minute. Then he starts walking. At 247 is the next photograph. And that's not a photograph of the scene. That's a photograph of Reynolds holding onto his press pass at his lanyard. And he, as a photographer, just snaps a picture of that. He didn't stop to take a picture. In his declaration, he says the ambulance came. But he doesn't say, I took a picture of it. And there is no picture in the record of the ambulance coming. Okay. Then where the rest of the time, if I can. Take another ten seconds. Okay. Where the rest of the time happens, the next photograph that you see is four minutes later, after Reynolds said he's going to cite him. He starts writing the citation. He says, go to your car to get your registration. While he's walking to the car, that's when this happens. He says, while he's walking, he takes a picture. He was obeying when he was stopped and cited within less than a minute after the conversation. Thank you very much. Ms. Wagner, thank you, too. The case just argued is submitted. 0916872 Herron v. Astru is submitted on the briefs. And that will conclude this session. We'll now stand in recess. Thank you. Thank you. Thank you.
judges: Cowen, Tashima, Silverman